UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDRA NICHOLSON, | No. 2:11-CV-03018-TLN-KJN |
| Plaintiff, | |
| v. | **ORDER** |
| ALLSTATE INSURANCE COMPANY, | |
| Defendant. | |

This matter is before the Court on Defendant Allstate Insurance Company's ("Defendant") Motion for Summary Judgment or Alternatively Summary Adjudication (ECF No. 28). Plaintiff Alexandra Nicholson ("Plaintiff") has filed an opposition to Defendant's motion. (*See* Pl.'s P & A Opp'n to AllState Ins. Co.'s Mot. Summ. J. or Alternatively Summ. Adjudication, ECF No. 34.) The Court has carefully considered Defendant's motion and reply as well as the arguments presented in Plaintiff's opposition. For the reasons set forth below, Defendant's Motion for Summary Judgment is **DENIED**.

I.   FACTUAL BACKGROUND[1]

Plaintiff owns the home located at 8975 Los Lagos Circle in Granite Bay,

---

[1] The facts are, for the most part, undisputed. Where the facts are disputed, the court recounts plaintiff's version of the facts as it must on a motion for summary judgment. *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988) (holding that a party opposing a motion for summary judgment with sworn affidavits is entitled to have her sworn statements taken as true for purposes of deciding motion). Accordingly, the Court, when necessary, cites to the parties' deposition testimony, Plaintiff's sworn declaration, or the exhibits provided by the parties.

1

California. At all relevant times, Defendant insured Plaintiff's home under a Deluxe Plus Homeowner's Policy.

### A. Insurance Policy Coverage

The Policy contains two sections, A and B. Section A is entitled "Dwelling Protection." (ECF No. 28-2 at 5.) Section B is entitled "Other Structures Protection." (ECF No. 28-2 at 5.) Additionally, the policy contains a section that sets out exclusions to the coverage provided under sections A and B. This Exclusion section contains the following applicable policy exclusions:

> 14. Vapors, fumes, acids, toxic chemicals, toxic gasses, toxic liquids, toxic solids, waste material or other irritants, contaminants or pollutants.
>
> 15. e) contamination, including, but not limited to the presence of toxic, noxious, or hazardous gasses, chemicals, liquids, solids or other substances at the residence premises or in the air, land or water serving the residence premises.
>
> 22. Planning, Construction or Maintenance, meaning faulty, inadequate or defective:
>
> a) planning, zoning, development, surveying, siting;
>
> b) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
>
> c) materials used in repair, construction, renovation or remodeling; or
>
> d) maintenance;
>
> of property whether on or off the residence premises by any person or organization.

(ECF No. 28-2 at 17−18.)

### B. The 2006 Claim

In Plaintiff's sworn declaration she states that she occasionally noticed bats flying around her property between 1993 and 2006. (Nicholson Decl., ECF No. 39 at ¶ 4.) In June 2006, Plaintiff began to hear noises coming from her bedroom wall, behind her headboard. (ECF No. 39 at ¶ 7.) Plaintiff went outside to explore the cause of the noise and saw bats flying out of the top of her home where the exterior brick wall meets the eaves. (ECF No. 39 at ¶ 8.)

Approximately five days later, Plaintiff noticed an odor inside the property. She subsequently obtained estimates to exclude bats from the property. (ECF No. 39 at ¶ 9.) Plaintiff alleges that she retained and paid an individual named Mark DeMontes $4250 to remove the bats and make the necessary repairs.[2] (ECF No. 39 at ¶ 12.) Plaintiff alleges that the bats had vacated the house prior to Mr. DeMontes beginning his repairs and that Plaintiff did not observe any bat activity until 2009. (ECF No. 39 at ¶ 16−17.)

Plaintiff filed an insurance claim and Defendant reimbursed Plaintiff for her expenses in the amount of $3841, pursuant to her policy.

### C. The 2010 Claim

At some point in 2009, Plaintiff began noticing bats gathering in the east area of her property. However, it was not until July 2010, that she again began hearing noises in her bedroom wall. At around 10 p.m., Plaintiff ventured outside with a flashlight to investigate and saw that bats had returned to the same general area of her property that they had inhabited in 2006. Plaintiff described the scene as bats "swarming and crawling and flying" around the eastern eave of the property. (ECF No. 39 at ¶ 20.) Plaintiff stated that she did not observe an odor at this time, but "about five days after I first noticed the bats in July 2010, a horrendous smell of dead animals began to permeate the house. There had been no smell of dead animals in the house since 2006." (ECF No. 39 at ¶ 22.)

After discovering that the bats had returned, Plaintiff tried to contact Mr. DeMontes, but was unable to reach him. Consequently, Plaintiff contacted Western Bat Specialists to come and inspect the property. Ken Clacher of Western Bat Specialists inspected the property on July 14, 2010. He prepared a report estimating the repair at $4500. Mr. Clacher testified that he observed the bats entering the property through gaps at the top exterior brick walls and proposed sealing the area to prevent re-entry.

Plaintiff contacted Defendant to file a claim[3] and Defendant assigned adjuster Jess

---

[2] Unfortunately, Plaintiff cannot provide any contact information for Mark DeMontes. (*See* Nicholson Dep., ECF No. 39 at 5.)

[3] The parties disagree as to whether Plaintiff first submitted a claim via mail in August 2010 or during a later phone conversation on October 22, 2010. (*See* ECF 28 at 11; *compare with* ECF 39 at 15.)

Molina to handle the claim. Mr. Molina and his manager, Frank Iaccino, met with Plaintiff at the property on November 4, 2010. Plaintiff walked both of them around the property and showed them where she had observed the bats. (ECF No. 39 at 7.) During the visit, Mr. Molina verbally denied coverage because "the policy does not cover damage caused by rodents, and [ ] 'bats are rodents.'" (ECF No. 39 at ¶ 28−30.) He also informed Plaintiff that the 2006 payment was an error and that claim, therefore, should have been denied. (ECF No. 39 at ¶ 31.) On November 6, 2010, Defendant issued a written denial letter with respect to the claim that is the subject of the instant matter. (ECF Nos. 35 at ¶ 15; 39 at ¶ 34.) The letter listed "BAT DAMAGE TO DWELLING" as the reason for declining policy coverage for the damages and enumerated Exclusions 14 and 15 in the policy as reasons for the denial. (ECF No. 28-24 at 8−9.) Due to a clerical mistake, the text of Exclusion 14 as listed in the letter is actually Exclusion 22 from Plaintiff's policy. Mr. Molina alleges that he intended to include the text of Exclusion 14 in the letter and not that of Exclusion 22. (ECF No. Molina Depo., ECF No. 28-4 at 76:19−77:25.)

### D. Repair of the Property

In May 2011, Mr. Clacher and Tyler Rhoades of Western Bat Specialists performed a bat exclusion[4] on Plaintiff's property. (ECF no. 35 at ¶ 16.) Mr. Clacher and Mr. Rhoades testified that during the exclusion, they noticed areas where the person who did the prior exclusion had: (1) not installed exclusion mesh (thus leaving exposed the gaps at the top of the bricks); (2) installed mesh, but left gaps around the rafters allowing bats to get in; or (3) left "buckles" in the mesh that also allowed bats to enter. (Clacher Depo., ECF No. 28-4 at 108:23−109:6, 109:16−110:12, 111:13−20, 112:8−15, 113:13−114:2, 120:14−121:2; Rhoades Depo., ECF No. 28-4 at 130:13−131:5, 133:10−25, 134:16−22, 135:4−14, 137:7−14, 138:16−23, 142:4−12.) Mr. Rhoades described an area of "about 26 to 30 feet" where no exclusion screening had been previously installed. (ECF No. 28-4 at 136:4−13.) In light of these issues Clacher admitted that, in his view, the prior exclusion was not properly performed. (ECF No. 28-4 at 113:20−114:23.) Further, Rhoades testified that it "looked like somebody had attempted to

---

[4] A bat exclusion can consist of removing alive or deceased bats as well as any bat guano from the premises, finding the area of entry into the home, and appropriately sealing the area to prevent further infestation.

4

do an exclusion badly" and with respect to an area around the garage, Rhoades noted that whomever did the prior exclusion "really goofed up." (ECF No. 28-4 at 128:24−129:19, 133:15−19.) Clacher and Rhoades both saw evidence that bats had entered the gap behind the brick in at least some of the areas where they found the problems with the prior exclusion. (ECF No. 28-4 at 109:16−20, 139:21−140:7, 140:17−142:3.)

Plaintiff refutes Mr. Rhoades and Mr. Clacher's testimony that the prior exclusion work was faulty. In her sworn declaration, Plaintiff states that after she discovered that bats were getting trapped in the walls of her house, she decided to remove some of the mesh wire screens to let them out. Plaintiff explained as follows:

> Obviously I wanted the bats out, and I certainly did not want bats trapped and dying inside the walls of my house, so I decided to remove some of the wire mesh screens to let them out. Using a ladder, I climbed up to areas I could reach with my hands under the eaves to remove some of the wire mesh screening, which were set in between the rafters and along the top of the walls. I did this around my garage and the west side of house just outside my bedroom. Some of the screens would not come off, and so I fastened a metal hook on the end of an old painter's extension pole that I had at the house. When fully extended, the pole with the hook was about 16 feet long. Using the extension pole and hook, I was then able to remove the screens more easily. Using a ladder and the extension pole, I was then also able to reach and remove screens at the second floor level of eaves. I was unable to remove some of the screens, and I ended up bending or breaking some of the screens. I did not attempt to remove all the screens. I was trying to let the bats escape so they would not be trapped, and so they would not die inside the walls of my house. I did this work over the course of several days in late August and early September 2010.

(ECF No. 39 at 6.)

### E.  The Current Action

Plaintiff repeatedly attempted to reach an agreement with Defendant concerning her claim. (*See generally* ECF No. 39.) On August 26, 2011, Plaintiff sued Defendant in Placer County Superior Court in connection with the claim denial, and Defendant subsequently removed the action to this Court. Plaintiff asserts claims against Defendant for breach of contract, bad faith and declaratory relief. In addition, Plaintiff is seeking punitive damages. (ECF No. 1 at 6−11.)

Defendant filed a motion for summary judgment on all of Plaintiff's causes of

action. (ECF No. 28.) In the alternative, Defendant moves for summary adjudication of Plaintiff's claim for breach of the covenant of good faith and dealing (bad faith) and punitive damages. Defendant contends that coverage was correctly denied pursuant to Plaintiff's insurance policy and that Plaintiff cannot establish elements of the individual causes of action. (ECF No. 28 at 2.)

## II. STANDARDS OF LAW

### A. Summary Judgment

Summary judgment is appropriate when the moving party demonstrates no genuine issue as to any material fact exists, and therefore, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotations omitted). Indeed, summary judgment should be entered against a party who does not make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Id.* at 322. *

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585−87 (1986); *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288−289 (1968). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits and/or admissible discovery material in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c). The opposing

6

1  party must demonstrate that the fact in contention is material, i.e., a fact that might affect the
2  outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
3  (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could
4  return a verdict for the nonmoving party.  *Id.* at 251−52.

5  In the endeavor to establish the existence of a factual dispute, the opposing party
6  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the
7  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing
8  versions of the truth at trial."  *First Nat'l Bank*, 391 U.S. at 288−89.  Thus, the "purpose of
9  summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there
10 is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory
11 committee's note on 1963 amendments).

12 In resolving the summary judgment motion, the court examines the pleadings,
13 depositions, answers to interrogatories, and admissions on file, together with any applicable
14 affidavits.  Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305−06 (9th Cir.
15 1982).  The evidence of the opposing party is to be believed and all reasonable inferences that
16 may be drawn from the facts placed before the court must be drawn in favor of the opposing
17 party.  *Anderson*, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air and it is
18 the opposing party's obligation to produce a factual predicate from which the inference may be
19 drawn.  *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244−45 (E.D. Cal. 1985), *aff'd*,
20 810 F.2d 898 (9th Cir. 1987).

21 Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing
22 party "must do more than simply show that there is some metaphysical doubt as to the material
23 facts."  *Matsushita*, 475 U.S. at 586.  "Where the record taken as a whole could not lead a rational
24 trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id.* at 587.

### B. Insurance Contract Interpretation

26 The California Supreme Court has held that "[i]nterpretation of an insurance
27 policy is a question of law and follows the general rules of contract interpretation."[5]  *MacKinnon*

---

[5] Although the Court's decision in *MacKinnon* dealt with traditional absolute pollution exclusions in the

1  *v. Truck Ins. Exchange*, 31 Cal. 4th 635, 647 (2003) (citing *Waller v. Truck Ins. Exchange, Inc.*,
2  11 Cal. 4th 1, 18 (1995)).  "A contract must be so interpreted as to give effect to the mutual
3  intention of the parties as it existed at the time of contracting, so far as the same is ascertainable
4  and lawful."  Cal. Civ. Code § 1636 (West).   When possible, the intent of the parties should be
5  inferred solely from the written provisions of the contract at issue.  *MacKinnon*, 31 Cal. 4th at
6  647; *see also* Cal. Civ. Code § 1639 (West).

   Judicial interpretation is guided by the "clear and explicit" meaning of the contract provisions in their "ordinary or popular sense," unless the parties use the terms in a technical sense or assign a special meaning by usage.  *See MacKinnon*, 31 Cal. 4th at 647−48; Cal. Civ. Code § 1638−44 (West).  A contract provision will be considered ambiguous when it is capable of two or more reasonable interpretations.  *See MacKinnon*, 31 Cal. 4th at 648.  However, the language of a contract must be interpreted as a whole and cannot be found ambiguous in the abstract.  *Id.* (citing *Waller*, 11 Cal. 4th at 18).  Furthermore, "'insurance coverage is to be interpreted broadly so as to afford the greatest possible protection to the insured, whereas . . . exclusionary clauses are to be interpreted narrowly against the insurer.'"  *Id.* (quoting *White v. Western Title Ins. Co.*, 40 Cal. 3d 870, 881 (1985)).  "Any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect.  Thus, the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language.  The exclusionary clause must be conspicuous, plain and clear."  *Id.* (internal quotations and citations omitted).

   The California Supreme Court has stated that this rule is specifically applicable where the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded.  *Id.* (citing *Gray v. Zurich Insurance Co.*, 65 Cal.2d 263, 272–273 (1966).  Thus, the insured bears the burden of establishing that the claim is within the basic scope of coverage, and the insurer bears the burden of establishing that the claim is specifically excluded.  *See id.*; *Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1188 (1998).

---

context of commercial general liability, the Court finds that its reasoning is equally instructive on interpreting residential insurance policy language.

### III. ANALYSIS

The Court will address each of Plaintiff's causes of action in turn.

#### A. Breach of Contract

Defendant presents the following three arguments for why it is entitled to summary judgment on this claim: (1) the claimed loss was not sudden; (2) the policy excluded coverage for faulty workmanship and construction under Exclusion 22; and (3) Exclusions 14 and 15 preclude liability for odor and waste materials. Each argument is addressed in detail below.

##### 1. Sudden Loss

The Insurance Policy states "[w]e will cover **sudden** and accidental direct physical loss to the property described in Coverage A−Dwelling Protection and Coverage B−Other Structures Protection except as limited or excluded in this policy." (ECF No. 28-2 at 16 (emphasis added).) Defendant contends that Plaintiff, as the insured, has the burden of establishing that her claim comes within the policy's basic scope of coverage. (ECF No. 28 at 15.) Defendant further argues that Plaintiff's loss was not sudden and thus not protected by the policy. (ECF No. 28 at 15.) Defendant's argument seems to rest on the premise that Plaintiff's entire claim is due to the smell caused by bat guano (which it contends was gradually produced and thus not sudden) and not the actual infestation. In support, Defendant cites *Prudential-LMI Commercial Insurance v. Superior Court*, 51 Cal. 3d 674, 698 (1990), for the proposition that examples of sudden damage include damages caused by fire or a windstorm and not gradual damage such as settlement.

Plaintiff argues that the loss was sudden and thus should be covered. In support of her contention, Plaintiff cites to Merriam Webster's definition of sudden as "happening or coming unexpectedly," contending that sudden infestation of bats "that appeared from nowhere, without warning" satisfies this definition. (ECF No. 34 at 9.)

Defendant's assertion that an insured has the burden of establishing that a claim comes within the policy's basic scope of coverage is correct. *See Royal Globe Ins. Co. v.*

*Whitaker*, 181 Cal. App. 3d 532, 537 (1986). However, the Court disagrees with Defendant's contention that Plaintiff's loss was not sudden. In interpreting the same language used in the policy provision at issue−sudden and accidental−the Fourth District California Court of Appeal found that the combined use of the terms requires defining them independently, "giving [sudden] a meaning with a temporal aspect-immediacy, quickness or abruptness-that does not allow it to cover events, such as happened in this case-that occurred gradually." *ACL Technologies, Inc. v. Northbrook Prop. & Cas. Ins. Co.*, 17 Cal. App. 4th 1773, 1787 (1993). Although Defendant has cited numerous statements made by Plaintiff alleging that the bat guano odor gradually became stronger, this does not negate the fact that the initial infestation may have been sudden. Plaintiff stated in her declaration that until June of 2010, there was no evidence of bat infestation after the original 2006 exclusion. (ECF No. 39 at ¶ 20.) In describing how she discovered the bats Plaintiff stated as follows

> I was laying in bed in my bedroom when I heard little banging, pinging and scratching noises coming from outside my bedroom wall. After about a half an hour, I went outside with a flashlight to see what was making the sound. I went to the exterior west wall of my bedroom and looked up with the flashlight and saw bats swarming and crawling and flying. The bats were making a banging sound against the metal gutters, and they were climbing along the tops of walls near the eaves at both the first and second floors.

(ECF No. 39 at ¶ 20.) This description does not support a gradual infestation. Furthermore, because the Court must adopt the facts as described by the Plaintiff, there is an issue of material fact as to whether the cause of the damage was gradual or whether the damage falls within the sudden and accidental language of the policy. As such, this Court declines to find that Plaintiff's claim fails on this basis.

### 2. Faulty Workmanship and Construction

Defendant contends that Exclusion 22, commonly referred to as the "faulty workmanship" exclusion, precludes coverage. Exclusion 22 bars claims caused by inadequate or defective: design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction or materials used in repair, construction, renovation or remodeling. (Exclusion 22(b)−(c), ECF No. 28-2 at 18.) Defendant contends that the policy excludes

Plaintiff's claims because the property's original construction did not meet the applicable California building code at the time of construction and further that the 2006 bat exclusion was defective. In support of its contention concerning the original construction of the home, Defendant has submitted an expert report from David Schwartz who inspected the property on September 26, 2012. In his report, David Schwartz stated as follows:

> At the interior sill of the entry hatch to the crawl space on the West Elevation, we observed a dead bat and what appeared to be bat droppings. (Refer to Photographs 37 and 38.) In the main attic space, we observed what appeared to be rat droppings. (Refer to Photograph 29.)
>
> We observed that the crawl space vents were protected by 1/4-inch grid wire mesh fabric. (Refer to Photograph 41.)
>
> We observed that the eave vents were also protected by 1/4-inch grid wire mesh fabric. (Refer to Photograph 2.) The gap located at the top of all brick veneer areas was also protected by 1/4-inch grid wire mesh fabric. (Refer to Photograph 4.)
>
> We observed that the brickwork on this home is unusual in that it is composed of many irregular bricks and includes "distressed" bricks. Distressed bricks are twisted, curled, or bent. Based on my experience with residential design, I understand that this house is intended to be of the "Storybook Style," which utilizes artisanal features such as the wavy, irregular brickwork and a curvilinear layout of the roof shingles.
>
> According to the construction documents, the horizontal and vertical gaps at the top of brick veneer areas were intended to be closed off by soffits and wire screens. (Refer to Exhibit F.) The as-built condition has two separate areas of wire screening: behind the eave vents and over top of the brick veneer to sheathing air gap under the eaves at the top of the walls. The latter screening appears to have been added at some point after original construction, judging by its level of corrosion compared to the screening behind the eave vents.
>
> Based on our observations, measurements, and investigation, it appears that the brick veneer assembly's planar irregularity caused a variable-size gap ranging from 1/8-inch to 1 and 1/4-inches, averaging about 3/4-inch between the back side of the brick and the building paper. The construction documents call for a uniform 1-inch air space behind the brick. (Refer to Exhibit G.) This gap would have allowed small bats to nest in the cavity behind the brick if not closed off. In addition, vertical irregularities caused by the odd-shaped bricks at the joint between the top of the brick veneer and the eave closure boards would also have allowed bats to enter attic spaces before these gaps were protected by wire mesh. (Refer to Photograph 6.) Note that the stucco veneer meets the eave closure boards tightly, and has never created a condition such that

11

1         bats could enter.  (Refer to Photograph 21.)

2         The gaps referred to in the preceding paragraph could have been avoided had the original owner-builder taken measures during construction to close off the gaps or protect them with wire mesh.

        We did not observe any evidence of bats in the attics (Refer to Photograph 28) or unfinished storage areas on the second floor. (Refer to Photograph 34.) The only evidence of bats was the single dead bat and bat droppings at the crawl space access hatch.  (Refer to Photograph 38.)  At the time of construction (Refer to Exhibit B), the California Building Code required that the weather-resistant system of the building envelope be continuous (Refer to Exhibit C). The Energy California Energy Code required that openings in the building envelope be sealed to prevent air infiltration (Refer to Exhibit D).  The California Civil Code required that human habitation spaces be free of vermin (Refer to Exhibit E).  Taken together, these regulations give rise to the construction industry standards of practice and care with respect to building envelopes. Those standards require buildings to have continuous, sealed envelopes that shall not admit unintentional water, air leaks, or vermin.

        The residence subject to this report fell below the standards of practice and care in the construction industry at the time it was built. As a consequence, bats were able to gain entrance to areas within the building envelope.

(ECF No. 28-3 at 9−10.)

        In response to Mr. Schwartz's report, Plaintiff argues that Mr. Schwartz had no way of knowing what the condition of the house was at any point between 1993 and June 2006. (ECF No. 34.)  In addition, Plaintiff alleges that there was mesh screening at the top of the walls at the eaves, and that she removed them in 2010 to allow bats trapped behind the screening to escape. (ECF No. 39 at ¶ 24.)

        Because the Court must consider the allegations in the light most favorable to the nonmoving party and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the opposing party, Plaintiff's allegations that she removed mesh screening creates a material question of fact as to whether the screens were in place when the house was constructed. *Anderson*, 477 U.S. at 255.  Thus, summary judgment on this issue is not appropriate. *See* Fed. R. Civ. P. 56(c); *Adickes*, 398 U.S. at 157.  Furthermore, the Court notes that Mr. Schwartz's report states that the home did not meet codes at the time of construction. Exhibit B of the report consists of building permit forms from 1990.  However, the code that is

1  offered to prove that the home was constructed in violation of the applicable code is dated 2001.
2  Defendant has not provided the Court with anything which reflects that the status of the
3  applicable code was not modified during the ten years that passed between the construction of the
4  home and the date of the cited code.  Accordingly, Defendant has not met its burden of
5  establishing faulty construction.

6  As to Defendant's contention that the faulty 2006 bat exclusion precludes liability
7  under the policy, Plaintiff's allegations that she removed screens prior to Mr. Clacher and Mr.
8  Rhoades performing the 2010 exclusion creates genuine issues of material fact as to whether the
9  2006 exclusion was in fact faulty.  Accordingly, summary judgment on this issue is also not
10 appropriate.  *See* Fed. R. Civ. P. 56(c); *Adickes*, 398 U.S. at 157.

### 3.  Policy Exclusions 14 and 15

12  Exclusion 14 of the policy states there is no coverage for damage caused by
13  "Vapors, fumes, acids, toxic chemicals, toxic gasses, toxic solids, waste materials or other
14  irritants, contaminants or pollutants."  Exclusion 15(e) is similar, stating there is no coverage for
15  damage caused by "contamination, including, but not limited to the presence of toxic, noxious or
16  hazardous gasses, chemicals, liquids, solids or other substances at the residence premises or in the
17  air, land or water serving the residence premises."  Defendant argues that bat guano and decaying
18  bat carcasses fall within the conditions described in Exclusions 14 and 15.  (ECF No. 28.)
19  Plaintiff argues that these pollutant type exclusions are generally understood to apply to
20  environmental disasters and should be narrowly construed as such.  (*See* ECF No. 34 at 17 (citing
21  *MacKinnon*, 31 Cal. 4th 635 (2003).)  Further, Plaintiff argues that the Court should consider
22  Exclusion 15 in its entirety and note that section 15(h) specifically states that there is no coverage
23  for damage caused by "insects, rodents, birds or domestic animals."  (ECF No. 34 at 18.)
24  Plaintiff contends that the inclusion of this clause implies that Exclusions 14 and 15(e) were not
25  intended to govern loss caused by animals.  (ECF No. 34 at 18.)  In support, Plaintiff has filed
26  documents under seal concerning Defendant's internal guidelines for claims involving skunks,
27  bats and raccoons (hereinafter referred to as the "Sealed Documents").  (ECF No. 33.)  Based on
28  the information set forth in the Sealed Documents, the Court is not persuaded that Exclusions 14

and 15(e) express the parties' intent to exclude Plaintiff's claim.

Moreover, the Court's conclusion is bolstered by the California Supreme Court's interpretation of pollution exclusion clauses within insurance contracts. In *MacKinnon*, the California Supreme Court considered whether these sort of "total pollution exclusion" clauses should be interpreted narrowly or broadly. In doing so, the court cautioned that when interpreting such clauses, although the examination of various dictionary definitions can be helpful in ascertaining the meaning of a term, they do not necessarily "yield the 'ordinary and popular' sense of the word if it disregards the policy's context." *Id.* at 649 (citing *Bank of West v. Superior Court*, 2 Cal. 4th 1254, 1265 (1992)). Thus, the court looked to the history and intent of the insurance industry in developing these exclusions and the fact that the exclusion grew out of the industry's desire to avoid coverage for "environmental disasters." *See Mackinnon*, 31 Cal. 4th at 643.

> Commentators have pointed as well to the passage of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, 42 U.S.C. § 9601 et seq.) in 1980 and the attendant expansion of liability for remediating hazardous waste (citation omitted) as motivation for amending the exclusion. "[T]he available evidence most strongly suggests that the absolute pollution exclusion was designed to serve the twin purposes of eliminating coverage for gradual environmental degradation and government-mandated cleanup such as Superfund response cost reimbursement."

*MacKinno*n, 31 Cal. 4th at 645 (quoting Stempel, Reason and Pollution: Correctly Construing the "Absolute" Exclusion In Context and in Accord with Its Purpose and Party Expectations (1998) 34 Tort & Ins. L.J. 1, 32). The court found that an expansive interpretation of these clauses may lead to an unreasonable interpretation. "'Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope and lead to some absurd results.'" *Id.* at 650 (quoting *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992)). For example, the court found that a reasonable policy holder would not understand such a clause to exclude any irritant, but instead would interpret the policy to exclude irritants commonly thought of as pollution. *Id.* at 652−53. Thus, the Court reads Exclusion 14 in the context of the policy agreement.

Exclusion 13, which immediately precedes Exclusion 14, excludes loss to the property caused by "soil conditions, including but not limited to corrosive action, chemicals, compounds, elements suspensions, crystal formations or gels in the soil." (ECF No. 28-2 at 17.) Exclusion 14 precludes policy coverage of "vapors, fumes, acids, toxic chemicals, toxic gasses, toxic liquids, toxic solids, waste material or other irritants, contaminants or pollutants." (ECF No. 28-2 at 17.) The Court finds that the combination of the preceding exclusion dealing with soil conditions and the boiler plate "pollution exclusion language" of Exclusion 14 is indicative of Defendant's intention that the language of Exclusion 14 apply to environmental pollutants. Defendant has not satisfied its burden of showing that a reasonable policy holder would understand that the terms "vapors, fumes, acids, toxic chemicals, toxic gasses, toxic liquids, toxic solids, waste material or other irritants, contaminants or pollutants" used in this context applies to any sort of mammal excrement. As such, the Court declines to find that Exclusion 14 bars Plaintiff's claim as a matter of law.

Defendant contends that Exclusion 15(e) similarly bars Plaintiff's claim. Exclusion 15(e) excludes any loss consisting of or caused by "contamination, including, but not limited to the presence of toxic, noxious or hazardous gasses, chemicals, liquids, solids or other substances at the residence premises or in the air, land or water serving the residence premises." Again, this clause is fundamentally a "pollution type" exclusion, and Defendant has the burden of presenting evidence that this claim is excluded as a pollutant. *See MacKinnon*, 31 Cal. 4th at 648.

In determining whether a claim is excluded pursuant to these pollutant exclusions, the California courts consider whether a substance is typically considered a pollutant by policyholders. *See MacKinnon*, 31 Cal. 4th at 654. In *MacKinnon*, the California Supreme Court held that pesticide was not excluded as a pollutant because "the normal application of pesticides around an apartment building in order to kill yellow jackets would not comport with the common understanding of the word 'pollute.'" *Id.* In making its determination the court analogized pesticides to carbon monoxide. Specifically, the court explained:

> [w]hile a reasonable person of ordinary intelligence might well understand carbon monoxide is a pollutant when it is emitted in an industrial or environmental setting, an ordinary policyholder would

15

> not reasonably characterize carbon monoxide emitted from a residential heater which malfunctioned as "pollution." It seems far more reasonable that a policyholder would understand [the policy] as being limited to irritants and contaminants commonly thought of as pollution and not as applying to every possible irritant or contaminant imaginable.

*MacKinnon*, 31 Cal. 4th at 652−53; *see also Am. Cas. Co. of Reading, PA v. Miller*, 159 Cal. App. 4th 501, 511 (2008) (quoting *MacKinnon* in determining that methylene chloride was excludable as a pollutant).

Here, Defendants have not presented any evidence that bat guano falls within the exclusions listed in 15(e). Although Defendant has cited Plaintiff's statements that the guano had a terrible odor in support of its claim that the guano caused a noxious vapor, gas or irritant, the Court declines to label guano a pollutant based solely on these statements. In fact, the only thing that Defendant has offered in support of its contention is the Wisconsin Supreme Court case *Hirschhorn v. Auto-Owners Ins. Co.*, 338 Wis.2d 761 (2012).

In *Hirschhorn*, the court found that bat guano was excluded as a pollutant where the policy specifically listed waste within the definition of a pollutant. The court found that "bat guano is composed of bat feces and urine. Feces and urine are commonly understood to be waste. Indeed, the ordinary meaning of feces is waste eliminated from bowels." *Id.* at 778 (quotation marks omitted). The Court does not disagree with these statements [6] since California law requires courts to consider the context of the terms used. *See Mackinnon*, 31 Cal. 4th at 649; *Bank of West*, 2 Cal. 4th at 1265.

The exclusions at issue are pollution exclusion clauses. Typically pollution claims stem from a leakage or seepage from a polluted area into some other area that causes the damage. That is not the situation here, in which the damage was caused by animals coming into the

---

[6] The Court notes that while the *Hirschhorn* court found that there are safety concerns involving bat guano, Defendant has not provided information to that effect. Further, the Court notes that bat guano is often used as a fertilizer and that the likelihood of contracting a disease from it depends on whether the droppings are contaminated with a fungal spore called H. capsulatum. This spore grows in soils throughout the world, but seems to grow best in soils with high nitrogen content. *See* Histoplasmosis: Protecting Workers and Risk, Center for Disease Control and Prevention, available at http://www.cdc.gov/niosh/docs/97-146/. Defendant has not provided the Court with any information as to the likelihood of gat guano carrying this spore or any other evidence concerning its classification as a pollutant. As such, the Court declines Defendant's invitation to unequivocally find that guano is a pollutant without adequate evidence of its toxicity.

structure of the home. As such, this case does not lend itself to the traditional situations in which a pollution exclusion clause would be invoked. Thus, an insured cannot be reasonably expected to believe that this clause precludes recovering on a claim caused by a bat infestation.

Moreover, the policy at issue can be distinguished from that in *Hirschhorn* because it has a provision that explicitly addresses coverage pertaining to damage caused by animals. Exclusion 15(h) states that the policy does not cover losses consisting of or caused by "insects, rodents, birds or domestic animals."[7] (ECF No. 28-2 at 18.) This clause further casts doubt as to whether Defendant intended for claims, such as the one at issue, to be governed under Exclusion 15(e) instead of Exclusion 15(h), which specifically addresses damage caused by animals. The *Hirschhorn* court did not consider a similar clause in determining that guano fell under the pollution exclusion. As such, the evidence presented does not show that the policy excludes coverage of Plaintiff's claim as a matter of law.

### B. Breach of the Covenant of Good Faith and Dealing (Bad Faith)

Plaintiff contends that Defendant breached its covenant of good faith and dealing and acted in bad faith in denying Plaintiff's claim. Specifically, Plaintiff alleges that Defendant delayed determining whether any benefits were owed to Plaintiff for the covered loss, failed to conduct a full and complete investigation into the facts and circumstances of the covered loss, refused to pay or provide benefits owed under the policy, and narrowly interpreted the policy in a manner calculated to deny Plaintiff's claim. (ECF No. 1 at ¶ 18.) Plaintiff further contends that Defendant's denial of Plaintiff's claim was willful and without reasonable cause. (ECF No. 1 at ¶ 19.)

Defendant counters that Plaintiff's claim fails for two reasons: (1) Plaintiff has no right to contract benefits; and (2) Defendant's denial of coverage was reasonable, whether right or wrong, and therefore not in bad faith. (ECF No. 28 at 20.) The Court has already declined to find that Plaintiff does not have a right to benefits pursuant to the insurance policy. Accordingly, the Court shall only consider Defendant's second argument.

---

[7]   Both parties have admitted that bats are not in fact rodents and are instead a member of the order Chiroptera and thus not excluded by Exclusion 15(h).

17

An implied covenant of good faith and fair dealing is implicit in an insurance contract, as in any other type of contract. *Major v. W. Home Ins. Co.*, 169 Cal. App. 4th 1197, 1208–09 (2009); *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 683 (1988). "An insurer is said to act in 'bad faith' when it breaches its duty to deal 'fairly' and 'in good faith' with its insured. *Major*, 169 Cal. App. 4th at 1209; *see also Chicago Title Ins. Co. v. AMZ Ins. Servs., Inc.*, 188 Cal. App. 4th 401, 428 (2010). To violate the covenant, an insurer must act unreasonably. *Morris v. Paul Revere Life Ins. Co.*, 109 Cal. App. 4th 966, 973 (2003). Unreasonable conduct is not synonymous with mistaken or even negligent handling of a claim. *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990). Instead, bad faith requires a "conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." *Id.* Thus, "the term 'bad faith' does not connote 'positive misconduct of a malicious or immoral nature; it simply means the insurer acted deliberately.'" *Major*, 169 Cal. App. 4th at 1209 (citing *Neal v. Farmers Ins. Exchange*, 21 Cal. 3d 910, 921–22 (1978)).

The Court notes that there are no California decisions on point. As previously discussed, no court applying California law has discussed the type of pollution exclusion clauses at issue under a similar set of facts. This issue is unsettled, and thus in a different situation the Court would not be willing to find that a defendant's belief that an insured's claim was excluded under an insurance policy's terms was unreasonable. *See Morris v. Paul Revere Life Ins. Co.*, 109 Cal. App. 4th 966, 974–76 (holding that an insurance company's denial of a claim was reasonable in light of the evolving state of the law at the time). However, in the instant case, the content of the Sealed Documents raises material issues of fact concerning the reasonableness of Defendant's denial of coverage in this situation, and further whether Defendant did in fact deliberately deny coverage in bad faith. *See Careau & Co.*, 222 Cal. App. 3d at 1395 (holding that deciding whether conduct meets the bad faith criteria must be determined on a case by case basis and will depend on the contractual purposes and reasonably justified expectations of the parties). As such, the Court denies Defendant's motion for summary judgment as to Plaintiff's bad faith claim.

### C. **Punitive Damages**

Finally, Defendant moves the Court for summary judgment on Plaintiff's claim for punitive damages, contending that there is no clear and convincing evidence of evil conduct or corporate ratification of such behavior. (ECF No. 28 at 22.) Plaintiff contends that Defendant's willful indifference creates a triable issue of fact as to whether punitive damages may be awarded. For the reasons set forth below, the Court agrees.

Tort damages in a bad faith action include punitive damages, provided that the requirements of California Civil Code § 3294 are met, i.e., "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice," (*see Silberg v. Cal. Life Ins. Co.*, 11 Cal. 3d 452, 462 (1974); 2 Witkin, Summary 10th (2005) Insurance, § 242, p. 357), and an officer, director, or managing agent participated in or ratified such conduct, (Cal. Civ. Code § 3294(b)). Thus, Plaintiff may be entitled to recover punitive damages if she can prove that Defendant not only denied or delayed the payment of policy benefits unreasonably or without proper cause, but also in doing so, was guilty of malice, oppression or fraud, *see Jordan v. Allstate Ins. Co.*, 148 Cal. App. 4th 1062, 1080 (2007), and that the conduct was ratified by Defendant, 2 Witkin, Summary 10th (2005) Insurance, § 242, p. 357.

The Court declines Defendant's invitation to decide that Plaintiff cannot prove that Defendant's agents acted with oppression, fraud or malice, and that Defendant ratified such conduct. The Sealed Documents proffered by Plaintiff combined with Molina's deposition testimony that he had reviewed such documents prior to his inspection of Plaintiff's property (ECF No. 40 at 36:8−40:25) and Plaintiff's allegations that Jess Molina repeatedly told her that he was denying her claim because "her policy did not cover rodents and that because bats are rodents there was no coverage" (ECF No. 39 at ¶ 28) create a triable issue of fact regarding whether Defendant's actions satisfy the requirement for punitive damages. Furthermore, the following alleged facts create a material issue of fact concerning whether Defendant ratified the conduct alleged by Plaintiff: (1) Mr. Molina and his supervisor Mr. Iaccino discussed the denial of Plaintiff's claim the night before the inspection of the property; (2) Mr. Molina's subsequent denial of coverage at the inspection was agreed with and thus ratified by his supervisor Mr.

Iaccino; (3) Mr. Iaccino made comments at the inspection alleging that they were ordered by the legal team to deny coverage; and (4) both Mr. Molina and Mr. Iaccino's conduct was later ratified by Allstate Representative Robert Jobe. The Court is aware that the clear and convincing burden of proving such damages is substantial, but finds that Defendant has not met its burden of showing that Plaintiff is foreclosed from doing so.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment and in the Alternative Summary Adjudication (ECF No. 28) is hereby DENIED.

IT IS SO ORDERED.

Dated: October 17, 2013

Troy L. Nunley
United States District Judge